The next case on the calendar is Ferrara v. Sterling. We have Mr. Bergstein for Mr. Ferrara. I see you reserved three minutes for rebuttal, and you can begin whenever you're ready. Okay. Good morning. Stephen Bergstein for the plaintiff. We have two issues. There's a hostile work environment claim, and there's a retaliation claim. And let me start with hostile work environment. The district court held that the age harassment was not severe or pervasive. The district court said there may have been inappropriate comments, but they were isolated. And we argue the jury can find that Boulot, plaintiff's supervisor, in fact, routinely made ageist comments about plaintiffs. I had trouble finding, figuring out or finding out where these stores were located. I take it they were in the northern district. But I think one of them, there was one, there was a store in Albany that was involved in something. Give me a little geographical... Albany County. Albany County. I think Saratoga County. It was a series of jewelry stores that you have in the shopping malls. Mr. Bergstein, I know that was the basis for the district court's decision, but they also urge us to alternatively rule that the Farringer-Ellworth defense controls here. I'd like to address that because it does seem like the company had a procedure in place written and a hotline. Your client did not utilize that. And then when he did complain to the company after having that conversation with Mr. Boulot, the company, the supervisor was removed immediately and never again was his supervisor. It resigned from the company. So why wouldn't the defense apply based upon the uncontroverted facts? It's not uncontroverted. Well, it's uncontroverted. He was never his supervisor again, right? After he complained, Mr. Boulot was not his supervisor anymore. Right, because plaintiff took a leave of absence before Boulot had a chance to supervise. I know. It's not the company's fault. The company can't. You're not challenging the constructive discharge claim. That's gone. Correct, correct. That raises a constructive discharge issue. But assuming there's no constructive discharge, the company, they did an investigation. He's gone. What else is the company supposed to do, I guess, is my question. We don't know what they did in pursuit of the investigation. There were no records in support of the Farringer affirmative defense. There's conclusions back and forth saying the investigation was ongoing. Did you do any discovery on that? There's no records on the investigation. What about the depositions? Did it come up in the depositions? Plaintiff was not asked any questions during any purported investigation into what happened. When you do a Farringer investigation, it has to be good faith. Why does that matter, though? I mean, I understand that if then an investigation clears the purported wrongdoer, you would want to be sure that investigation was done in good faith. But here, where your client is never supervised by the individual again, what does it matter to know more about the nature of the investigation? Would your client have gotten anything more if the investigation had been, in your view, more thorough? It may have given him more confidence that the company was recognizing that he was wronged by Gulo's repeated comments. That's not a Title VII concern, is it? I mean, your client is complaining of hostile work environment. Once this is known, once this is brought to HR's attention, he never works for the man again. Am I right? Yes. But he did say, Plaintiff did testify that there was an announcement made following any investigation that Gulo was going to be supervising Plaintiff's supervisor. The problem is that Plaintiff then left before Gulo had a chance to actually supervise Plaintiff's supervisor. But you still have to do a good faith investigation or else the employer is essentially adopting the hostile work environment. Suppose your client complains. The next day the person he complains about just says, I'm leaving the company. I'm gone. I had enough. What's the company supposed to do? Going to Judge Radji's point, whether they do a good investigation, bad investigation, they had a procedure for complaining, their client didn't utilize it until X day, and basically immediately following that day, the guy is gone. Well, he did complain to HR. I understand that, but the guy never supervised your client again. I am not sure that an employer is off the hook in a hostile work environment claim simply if the offender either leaves the company or doesn't supervise the plaintiff again. My understanding was they still have to do a good faith investigation to distance themselves from what happened, put in place a new policy, reassure the plaintiff that, you know, we took your comment seriously. I don't think the law is that clear that if Gulo leaves that the employer doesn't even have to do anything or there's no requirement to show they did a good faith investigation. But what we have on this record is there's no real evidence of a good faith investigation. On the retaliation claim, you can correct me if I'm wrong. Again, I think there's uncontroverted performance evaluations going way before even Mr. Gulo was a supervisor indicating that your client was not meeting, you know, the sales expectations repeatedly. I can read some of them to you, but it seems like it goes all the way back to. Oh, I know what they say. I'm familiar with them. But the problem with that argument is that it's not conclusive he wasn't meeting performance goals. I know what the performance reviews say. The anomaly in this case is that while those reviews were being written up, some of them by Gulo, he was also getting a series of certificate of achievements. He got eight of them for 2016, district manager of the year in November 2016, significant of recognition for sales in 2017. The problem with the case is that you have negative performance reviews but very positive certificates that reflect good job performance. Some of the negative performance reviews were written by Gulo, which puts them, which makes them questionable. What about the ones that weren't written by Gulo? And what about the fact that there's two other executives who put in certifications that they independently concluded that he should be demoted? But they recognized that Gulo contributed to that demotion determination. It wasn't just those two. Gulo participated in that decision. If Gulo participates in the decision to demote, and we know how he feels about older managers, it puts, it taints the demotion process because you have an age discriminator who dislikes the plaintiff for stereotypical reasons. How do you know what role he played in that other thing? Well, he... Did he depose them? They put in, we came to our own conclusion. We have an independent assessment based upon the data, the reports, that he should be demoted. So... Some reports. Did they meet with him? Some reports. Not all the reports. I mentioned the certificate of achievement. There's a series of positive achievements in the record during, for this time period also, counteracting the negative reviews. But if Gulo participated in the decision, right, that's a bicker staff problem for them because it taints the process because of Gulo's discriminatory... How should we look at the fact that in May of 2017, this is before any complaints, right? There's a report that says he's deficient because six of his 12 managers, as well as eight of his 13 assistant managers, are well below sales standards year to date. He's consistently underperforming leadership and sales positions that were not supported by a qualified team. So this is before any complaint. That's May 2016, I think. He said 2017. Okay, but... It's before any complaint, right? Right. But what about the positive certificates he was getting? What about the... What about the positive certificates he was getting? But the bottom line is, in May, he's told that he's going to be demoted if this does not improve. So that's what the company has told him in May. But he also gets a certificate of recognition for 2017, which is the year he was demoted, for 102% sales year to date. So that counteracts what happened in May 2016. The problem with the case, evidentially, is that you have negative reviews. I recognize that. But then you have all these positive certificates. He's demoted shortly after he told Gulo to leave me alone, stop at the comments. It's the next day, I believe. Correct. Right. But there are so many people that have to sign off on this that it struck me as unlikely that they all did it within 24 hours. Does the record tell us when some of these people in the chain signed off on his demotion? I don't think so. But that, if there's an ambiguity about when the decision was made, but we know Gulo contributed to the decision because they recognized that in their affirmation. Isn't that a bigger staff problem? If you have one of the decision makers contributing to the demotion who makes age-related insults to the plaintiff, that places an issue, whether there's a discriminatory motive or whether the real reason for the— But you did no discovery to determine whether or not he influenced, how he influenced these other two individuals. That's what I'm having trouble with. You did not. You're assuming that he had some undue influence over them. But the law is not if somebody makes a recommendation, no matter how many people they make it to, no matter how much their assessment may have been independent of that recommendation, that somehow you get a trial. That's not the law of this circuit. I thought in cases like Bicker Staff, if one person along the chain of decision-making has a discriminatory attitude toward plaintiffs, that creates an issue of fact about discriminatory intent. That would be Gulo. If there's three people who made the decision, one of them is Gulo, that's 33%, right? We don't know if he had the final decision, but he contributed to the decision. And we know how he feels about the plaintiff. We know how he feels about the plaintiff's age. Wouldn't that persuade a jury that there's some age-related animus entering into the retaliation? I think we understand the arguments. Thank you. You have your three minutes in rebuttal. We'll hear now from Mr. Luckner. Good morning, and may it please the Court. My name is Stephen Luckner. I represent Sterling, Inc., the defendant appellee. I'm happy to start off by addressing any questions that you may have. Well, I skipped. Mr. Burstein was going to talk about the district court's basis for its ruling on the hostile work environment. And I guess my question to you would be, the district court has called it isolated comments, but as Mr. Burstein pointed out, the declaration states that these comments were repeated comments, that it wasn't one occasion, that it was over and over and over again. So wouldn't that be problematic under our case law on that ground? Right. Well, I think that with regard to that, the problem is that he only specifically identifies one incident. He goes on to say countless. Now, we don't know what counts. I don't understand. If someone uses a derogatory term and says this is the term they used and it happened dozens of times, why isn't it? I mean, in my cases where we have concluded that if it's a derogatory term, you don't have to give chapter and verse of every date that it happened, right? No, that is correct. And I think that for the, you know, and this goes to the pervasiveness, I don't think that there's any argument that, you know, the comments, you know, were so severe in and of itself to satisfy the burden. So with regard to pervasiveness, I think one of the things that we have to consider is also the amount of time, right? If somebody makes three comments over the period of a week, you know, that could be considered pervasive. If somebody makes three comments over the period of 18 months, that might not be considered pervasive. And I think the problem here is that. Well, he said over the course of six months in his declaration, he referred to me as a dinosaur dozens of times. He ridiculed me for an anti-shea case, which had a pull handle. He said it's an old man's bag. The district court even had other ones that were from the complaint. So I don't think we have any cases, maybe I'm missing it, that have said that's all true, that that's not enough to at least get a trial on pervasiveness in terms of derogatory terms, right? Yeah. I mean, once again, I think that, you know. Is there a case where we have said that that wouldn't be enough? I think that. Well, I think the Court found it compelling that, one, while he says there were countless, he never complained about any of it over this entire period of time. Well, that's separate from whether or not he can show more than one. I mean, you had discovery in this case. That is correct. What were you able to develop in discovery about your now assertion that he can't demonstrate pervasiveness? Well, what we established was that there was no other evidence. There was no witnesses. Well, he's the witness. Correct. But, yes, through discovery, what we established is all he said was that this happened a lot. Yeah. Did you ask him how many times? What? Well, we asked him how many times, and he replied countless. Was his, you know, and then, you know, more specifically, no, I can't tell you. Did he say that? What? I believe that he said that when, you know, when he was asked, you know, what does that mean? So now you're left with, well, we don't have any evidence. Nobody, there's no other witnesses to this other than him saying it was countless. You know, he used this, you know, pejorative term. But he's the eyewitness to this. You're telling us this isn't enough for him to go to the jury and tell the jury that it happened repeatedly. If he can't cite particular days, the jury may be more skeptical. On the other hand, I'm not sure that it's not enough for the jury to take into account that he experienced it and he's saying it happens regularly. Well, and I think that the district court also, you know, analyzed, you know, it's, you know, severe pervasive and how do we, you know, judge pervasiveness. And one of the things they look at is, you know, did it alter the conditions of his employment? And the court then looks at that and says, well, the fact that he never complained about this over the course of Gullo's supervisors and for almost 18 months, that he never makes a single complaint about this, you know, goes to the analysis of pervasiveness and that it's not just solely the number of times. What case have we said that if you delay in complaining, even if there's a lot of comments, that somehow the pervasiveness thing is gone? I don't think we've said that. I'm not familiar with that concept that obviously complaining can be an important fact, but the failure to complain by itself renders, takes away, no matter how pervasive it was. What case did we say that? Well, I don't necessarily know that it's a case, but I don't think that there's a bright line rule as to pervasiveness, right, which means that the court has to do an analysis of, you know. Well, no, it may mean that the jury has to do an analysis. I mean, your argument is that this could not support a finding for the plaintiff as a matter of law. That's different from saying it's a really weak case. No, that is true, but I think that the court did analyze the pervasiveness element and ultimately came to the conclusion that as a matter of law, you know, what he is saying, you know, would not have altered the conditions of his employment. And, you know, how do we know that? Well, it's not a bright line rule, but one factor may be, well, did he complain? Two, did his performance change, right? From when he says Gullo started doing this to me, you know, it completely changed, you know, the conditions of my employment and things started going downhill. Why don't you focus on the firing or health defense? You heard Mr. Bergstein's argument. He's saying that even if there was no supervision after the complaint, that that still doesn't mean you're entitled necessarily to the defense. What's your response to that? Well, I mean, my response to that is, and I agree with the bench, but I think it's very important to note that while there may be no written report of the investigation, at deposition, Mr. Gullo was asked, and you indicated, I believe, you were told when finally you made the complaint after your demotion to Kazam that you identified people for him to speak with who were also allegedly having issues. Answer, yes. And did he speak with them? I believe he did, yes. They told me so. So while they want to say, well, there's no evidence of a good faith investigation, Mr. Ferrara said, I gave them the names of people to speak to, and they spoke to them. You could have done a better job on that. You could have put in a declaration from someone at the company saying we did an investigation X, Y, and Z. I don't know why you didn't do that. I understand what you're saying. There are e-mails and there was that reference in the deposition, but. Well, and with his testimony, I don't think there's any evidence controverting the fact that he gave us, he gave them names, they spoke to those people. Now, whether or not they do a formal report, I don't know that the Farrer or Ellerith defense requires them to do that other than to engage in a good faith investigation, which clearly shows that they went out, they spoke to people. Gullo, and there's also a misnomer in the timeline here. Ferrara doesn't go out immediately. Ferrara doesn't go out until February of the following year. So from the time this occurred, the demotion on September 3rd of 2017, September, October, November, December, January, okay, all that time, Mr. Gullo does not supervise him. They want to say, well, it looks like he was supposed to. He never does, and it's not because he just went out on leave. It's because he was there and Gullo never supervised him. That's uncontroverted. Gullo then leaves, and then he takes a leave of absence, but not until another five months, and that's not controverted. It wasn't clear to me who was supervising the plaintiff during that time. A woman named Joanne Falta. And that's in the seminal record? Absolutely. And Ms. Falta also then performs performance analysis, which are almost identical to Mr. Giffords and Mr. Gullo's, before and after all of this. Okay. What's really strikingly is the consistency of the poor performance across numerous supervisors. Let me ask you about that, because that's really the focus of the retaliation claim. So I think to boil down the argument, it is, although we have said that timing alone is not enough at summary judgment, his pointing to that there are some awards out there that he says are enough to create an issue of fact with respect to the poor performance, in addition to the timing. So why don't those awards create an issue of fact? Yeah, well, I think if you, once again, you know, I think it distorts these awards, and I think that the district court, you know, clearly grasped on this, is that these awards are either older for a period of time prior, for a much shorter period of time, like sales for a month, or, for the most part, these achievement certificates. These aren't reviews, like the sales reviews or the write-ups. These are certificates that people get. And if you go and look at them and the district court grabbed on this, they were things unrelated to sales, such as jewelry repair, credit applications, guest experience. So he's getting certificates for saying, oh, you're creating a good guest experience. Oh, the store is doing a lot of repairs. But that's not what he's being criticized for, year after year after year, by failing to meet his numbers in his district and multiple stores within the district. So while they want to say that, oh, there's contradictory evidence, if you actually look at the evidence, which the district court did and painstakingly went through each of these documents, what you find is that these are not the same things as the annual reviews and the performance write-ups that he was receiving. These are things that, you know, are not necessarily what he's being judged on for his overall performance. Thank you, Mr. Walker. May I just ask one question? Sure. The demotion occurs the day after the plaintiff complains to Gullah. I asked plaintiffs' counsel, it seemed to me, given the number of people who signed off on this decision, that it would have taken more than 24 hours to do this. But I don't have anything in the record that shows that. I would have thought that would have been something you all could have developed if that were helpful to you. Yeah. I think, interestingly, there is a document. Is it in the record? There is a document, Exhibit D. Exhibit? D. Where is it in the record? Let's see. JA35. And what am I looking at there that helps me see that? Right. Well, what it helps you see is the other two people that signed off on the demotion. What it does not have is a — When? When did they sign off? Right. What it doesn't have, oddly, and it's just a form, but it doesn't have the actual date of when they did. I have to look at all of this evidence in the light most favorable to the plaintiff. I suggested to you that it would be curious if it was all done within 24 hours, but I suppose not impossible. And you don't have any evidence that says, well, one of them decided it a week before and another one of them decided it three days before. You don't have any evidence like that. No, that is correct, Your Honor. There's just, you know, going back, the document's just undated. What we do know is that, you know, Ms. Hammond, who was the VP, and Mr. Watson both, you know, signed off on this demotion and that they've submitted affidavits basically that they did so solely based on his performance metrics and nothing else, as well as Mr. Watson putting in his affidavit that he personally spoke with plaintiff numerous times with regard to his performance. I mean, it should not have been a surprise at this point to Mr. Ferrara that he was being demoted. I think Gifford, Watson, Gullo, and if you read the reviews, they all say, you know, I just had a simple question. I know you've answered it. All right. Thank you. All right. Thank you. All right, Mr. Bergstein. You have three minutes in the boat. Some of the certificates did relate to sales statistics. Page 191, he got a certificate for 1.5% increase in sales standard. That was for 2016. In 2017. But if you have a good month, that doesn't necessarily mean that there's not an overall problem. These are documenting our year, yearly below expectations, right? Just because you might get an award for a good month, I don't know how that addresses the overall issue. But then he got one for 2017, sales year to date. Year to date, 102% for 2017. That's the year he's demoted. What's he referring to? My records show a joint appendix 204. So that was January 2018 they gave that to him. He was demoted. By September, by September of 2017, what are his sales figures for the nine months up to that point? I don't know if that's been isolated, what he was doing on a month-to-month basis. But the point is, if he got a certificate. I thought that they did. I mean, I don't have it right here. But I thought there was evidence that by September of 2017, he was quite far behind. But he finished the year with 102%. That's January of 2017, or am I looking at the wrong thing? No, that award was given in January 2018 for the year. I see. So the point is, it's not clear how bad it was or how good it was, because you have evidence that's all over the place on the extent of his sales. The issue of who made the recommendation, joint appendix 35, which we just talked about, actually talks about two people making the active recommendation, Goulow and Hammond. And Watson supports the recommendation. So it's really down to two people who make this decision to demote the plaintiff. One of them is the age discriminator. On the issue of Farragher, I am not sure that if the manager leaves after any investigation, that that completely gets the company off the hook for the hostile work environment if they don't conduct a good faith investigation and they don't take steps to distance themselves from what happened to the plaintiff. I don't know of any case that actually supports the proposition that having the manager leave is enough to satisfy the employer's affirmative defense under Farragher. I just want to ask you, I'm looking at this 204. It seems like your client wrote these post-its on the award as to what the significance is. Yes, but if we ignored that, and I am. If you just ignore that, it does say year to date, but we don't know if it's January of 18. It doesn't give any context. We don't know what year to date means in the context of getting something on January 10th of 2000. Well, I don't think you would get an award for year to date on January 10th, right? What does it relate to? 2017, would you give somebody an award on January 10th for year to date? Sales for what? Sales overall? Sales for one store? Sales. Well, he's supervising a number of stores. It says T, I know, but it seems 0286. That could be, we don't know what that means. That could be one store for all we know, right? Right, it's not clear on this document. He wants to have a trial because he got a certificate where we have no information about what that means in the grand context of all these other reports that say he was well below repeatedly. So I think you might be overstating what inference could be drawn from that certificate. All right, thank you. Thank you. We'll reserve the decision. We thank you both and have a good day.